# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 21, 2026

Lyle W. Cayce
Clerk

No. 24-50800

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

MICHAEL FULLERTON,

*Defendant—Appellant*,

CONSOLIDATED WITH

No. 24-50829

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

TIFFANY FULLERTON,

*Defendant—Appellant*.

Appeals from the United States District Court
for the Western District of Texas
USDC Nos. 1:21-CR-216-1,

1:21-CR-216-3

_____

Before KING, HIGGINSON, and DUNCAN, *Circuit Judges*.

STUART KYLE DUNCAN, *Circuit Judge*:

Michael and Tiffany Fullerton, with two others, fraudulently obtained over $3,000,000 from the COVID-era Paycheck Protection Program ("PPP"). Michael pled guilty to eleven counts of conspiracy, bank fraud, wire fraud, money laundering, and identity theft. The district court sentenced him to 286 months' imprisonment. Tiffany went to trial and was convicted of two counts of conspiracy for bank and wire fraud and money laundering. The district court sentenced her to 108 months' imprisonment.

Michael appeals his sentencing enhancements for using sophisticated means, sophisticated laundering, leading a conspiracy with five or more participants, and obstruction of justice. Tiffany appeals the denial of her motion for a new trial, a sentencing enhancement for suborning perjury, and the district court's calculation of her intended-loss amount.

We AFFIRM the sentences and denial of the motion for a new trial and REMAND for correction of a clerical error in Tiffany's judgment.

I

PPP helped small businesses weather the COVID-19 pandemic by providing forgivable loans to cover payroll and other authorized business expenses. Beginning in April 2020, Michael and Tiffany Fullerton, with their business partner Scott Starkes and employee Joseph Robles, stole $3,027,526.11 from PPP by submitting six fraudulent loan applications.

A

The group launched their conspiracy by submitting a fraudulent loan application for Starx Investment Holdings ("Starx"), run by Scott Starkes.

2

Starx held Georgetown Collision Center ("Georgetown"), a real business that Michael owned and operated and Tiffany managed.

Michael and Starkes applied for a PPP loan under Starx's name to help fund Georgetown. To be eligible for PPP funds, Michael devised a scheme to portray Georgetown's independent contractors as W-2 employees. That scheme entailed Tori Gaines, who worked for Georgetown, "enter[ing] false and fraudulent information" into Georgetown's business software to craft fake W-2s, W-3s, and other tax and employment records. To give the business software the data needed to generate the fake records, Michael and Gaines pulled information from real independent-contractor records and entered it in the business software "as if it was W-2 or salary information." Michael described Gaines's falsifying efforts as a "massive task" that took "weeks" because Gaines "rebuilt" the business software. Once they finished, Starkes filled out the fraudulent PPP application by hand and submitted it with the fabricated records. The loan was funded for $599,900.

More fraudulent applications followed.

Michael next electronically filled out an application for Fullerton Consulting Group, L.L.C. ("Fullerton Consulting"), a no-asset, defunct entity Michael had used for past business ventures. This application included an entirely fictional financial report created by "F. William Johnson"—a nonexistent New York attorney. Another supporting document indicated it was prepared by S.S., a certified public accountant. But S.S., though a real person, did not prepare it. Michael forged S.S.'s signature and included his tax ID number (with an error) on the document. (Subsequent PPP applications repeated this identity theft.) Fullerton Consulting's loan was funded for $259,134.

The next application was for FCG Automotive and Collision LLC ("FCG"), for which Tiffany served as registered agent. FCG, too, was defunct and assetless. Its Texas registration expired in 2018, but Tiffany reactivated it seven days before submitting the fraudulent PPP application. Tiffany completed the PPP application for FCG—her electronic signature was on the application, and it included her driver's license, social security card, and birth certificate. Michael, however, testified he completed the application on Tiffany's behalf. As with the other applications, this one included fake supporting documents. It was funded for $500,000.

Ten days later, the conspirators submitted the first of three more fraudulent PPP applications for yet another defunct entity, MTF Racing LLC ("MTF"). MTF's registration was forfeited, but Joseph Robles, a Georgetown worker, reactivated it soon before the applications. Michael compiled the application; listed Robles as MTF's owner, President, and CEO; and signed Robles's electronic signature. Robles allowed Michael and Tiffany to use his identity in exchange for about $100,000 when they asked for permission at a birthday party they threw for Robles at their home. The first application was denied because MTF's employer identification number (EIN) was submitted after PPP's eligibility cutoff date. The EIN had also been purportedly submitted by Tiffany's father, but that submission came from an IP address at Georgetown, not from Tiffany's father. But the following two applications, with Robles's name and identifying documents, were funded for $834,200 and $834,292.11.

All told, the conspirators submitted six fraudulent PPP applications and received $3,027,526.11 from five of them.

B

Michael and Tiffany needed to conceal the source of the funds. So, they made numerous transactions Michael admitted were designed "to

conceal and disguise the nature, location, source, ownership, and control of" the funds.

For instance, the $500,000 for FCG's PPP loan went to Tiffany's personal bank account. That same day, Tiffany opened a brand-new account in FCG's name with her handwritten signature and handwrote a deposit slip to transfer the funds from her personal account to the new one. From there, Tiffany transferred some of the money to Fullerton Consulting's bank account. Testimony at Tiffany's trial clarified that these transfers indicated money laundering.

MTF's PPP funds were similarly hidden. Michael and Tiffany helped Robles open a business account for MTF because Robles was listed as MTF's President. Michael gave Robles the necessary paperwork, and Tiffany coached him not to wear a Georgetown Collision shirt when he opened the account and to make sure the bank teller knew he was MTF's President and owner. The bank, however, froze the account after the PPP funds were deposited because Robles had unpaid child support. After the hold lifted, Tiffany accompanied Robles to the bank to clean out the MTF account. Robles withdrew one cashier's check for $1,000,000 and another for $115,000 and immediately handed them over to Tiffany.

The $115,000 cashier's check bought a Toterhome (a recreational vehicle that can tow heavy equipment). And the $1,000,000 cashier's check funded a new Fullerton Consulting account Michael and Tiffany recently opened. Money from that account bought land in Oklahoma, two vehicles, and funded numerous business ventures in Oklahoma. The ventures included a marijuana cultivation and dispensary business, a bar and grill, and an auto/boat repair shop. Tiffany formed or served as an official for several of these Oklahoma businesses. And testimony at Tiffany's trial explained

that sending funds to out-of-state business ventures indicated money laundering.

Michael and Tiffany also built layers of complex transactions to help launder the funds. For example, Tiffany repeatedly withdrew cashier's checks from various accounts and then exchanged them for cash or other cashier's checks. A few days after Michael and Tiffany discovered they were under investigation, Tiffany withdrew three $150,000 cashier's checks for the Oklahoma ventures. She then exchanged them at various times for other cashier's checks, bank credits, or cash. This second layer would then sometimes be exchanged for bank credits again. And again, testimony at Tiffany's trial clarified that this scheme was a "great example of money laundering" because of the "layering that's happening to try to hide the original source of the money with cashing out and credits." Tiffany performed most, if not all, of these laundering transactions.

Michael and Tiffany squandered the laundered funds on spates of other purchases. These included a boat named "Breakfast at Tiffany's;" two Rolex watches; a race car; a large toolbox; land; a Corvette; a Bentley; other vehicles; over $331,000 on credit cards or other debts; and casino trips. The casino trips aided Michael and Tiffany's money-laundering efforts.

C

Michael was indicted for eleven counts of conspiracy to commit wire and bank fraud, wire and bank fraud, conspiracy to commit money laundering, engaging in monetary transactions with criminally derived property, and aggravated identity theft. He pled guilty to all eleven counts. And he confirmed the factual basis in his guilty plea was accurate, initialing every page.

Michael's Presentence Investigation Report ("PSR") set his total offense level at 37 and recommended four enhancements: (1) two levels for

using sophisticated means, (2) two levels for engaging in sophisticated laundering, (3) four levels for having an aggravating leadership role, (4) and two levels for obstructing justice by perjury. Michael objected to all four. The PSR calculated his Guidelines range at 262 to 327 months' imprisonment.

Tiffany was indicted for conspiracy to commit wire and bank fraud and conspiracy to commit money laundering. She pled not guilty and chose trial.

Former Agent Robert Rutherford of the Treasury Inspector General for the Tax Administration Office testified at Tiffany's trial. He confirmed that Tiffany managed Georgetown, explained how the PPP applications were fraudulent, traced the money laundering transactions, and recounted the unauthorized expenditures. He also recounted his interviews with Tiffany. In the interviews, Tiffany denied any knowledge of the fraud and explained she only learned of it in February 2021, nearly a year after it started. She admitted, however, that she knew about $1.6 million in PPP funds and the unauthorized expenditures, despite being "unsure" or forgetting where the funds came from. To explain her alleged lack of awareness, Tiffany said Michael ordered her to make the laundering transactions and that she often purchased cashier's checks, made deposits, and opened bank accounts on Michael's behalf without "ask[ing] questions."

Michael was Tiffany's main defense witness. He claimed that all of Tiffany's fraud and laundering transactions were at his request and without her knowledge. For example, despite knowing about the PPP funds, Michael testified that Tiffany was not aware the loans were fraudulent. And he declared that Tiffany did not submit the fraudulent application for FCG despite it bearing her electronic signature and including her identification documents. Michael contradicted Robles's testimony that Tiffany was present when they asked to use Robles's identity. And he claimed Tiffany did

not know about the fraud until October 2021, contrary to Tiffany's statements to Agent Rutherford.

The Government highlighted contradictions between Michael's testimony and his sworn factual basis on cross-examination. Michael dismissed the discrepancies by insisting he did not read his sworn statement. But Michael did admit he told Starkes he would take the fall for the conspiracy if they were caught. And Michael "had many conversations with [Tiffany] and her attorneys about what questions to ask [him]" at trial. These conversations between Michael and Tiffany, and later Tiffany's attorneys, went "for hours," were "very detailed" and "thorough," and covered "what questions to ask" Michael. On redirect, Michael admitted that he texted Tiffany in December 2020, "if I go to prison over this PPP deal, you are now fucked because all this will die with nobody to run it," "I will take all the blame for the PPP stuff. I'll do the time if it comes to that," and "[t]his is life changing money for all of us forever. The only obstacle is the PPP deal and I'll take that if needed."

The jury convicted Tiffany of conspiracy to commit bank fraud and conspiracy to commit money laundering but acquitted her of conspiracy to commit wire fraud.

Tiffany's PSR set her total offense level at 29. Her Guidelines range was 87 to 108 months' imprisonment. The PSR included the April 2020 Starx loan in the intended-loss amount because it found Tiffany joined the conspiracy "[b]eginning in April 2020." Tiffany objected to the intended-loss amount calculation by arguing the Starx loan should not count because it was neither in her indictment nor fraudulent. The Government responded that the Starx loan was relevant conduct.

D

The district court sentenced Michael and Tiffany together.

8

Before sentencing, the court announced it was considering whether Tiffany should receive an enhancement for obstructing justice by suborning Michael's perjury at trial.

At sentencing, Michael reiterated his objections to the four enhancements. The district court overruled them and adopted the PSR without change. It sentenced him to 286 months' imprisonment and three years' supervised release.

The district court also overruled Tiffany's objections. It applied the obstruction-of-justice enhancement because it found that Tiffany knew beforehand that Michael would lie and procured his perjury by asking questions she knew would elicit exonerating answers. With that enhancement, her Guidelines range rose to 108 to 135 months' imprisonment. The court sentenced her to 108 months' imprisonment but stressed that it would have set the same sentence with or without the obstruction enhancement because 108 months' imprisonment fell within the Guidelines either way.

Tiffany moved for a new trial based on newly discovered evidence. She claimed that Michael's PSR revealed that Michael used his ex-wife to help commit fraud without the ex-wife's knowledge. In Tiffany's view, that evidence from 1996 would "corroborate" Michael's testimony that Tiffany knew nothing of fraud in 2020. The district court denied the motion. It concluded that Michael's decades-old conduct with his ex-wife was likely immaterial and unlikely to produce an acquittal, that Tiffany could have discovered the evidence before her trial with due diligence, and that the evidence was likely inadmissible.

Michael and Tiffany appealed. The appeals were consolidated upon the Government's motion.

II

We first consider Michael's challenges to his four sentence enhancements. Each fails.

We review the district court's application of the Guidelines *de novo* and its factual findings for clear error. *United States v. Lopez*, 168 F.4th 316, 320 (5th Cir. 2026). The district court clearly errs in its factual findings only if this court is "left with the definite and firm conviction that a mistake has been committed," *United States v. Clements*, 73 F.3d 1330, 1340 (5th Cir. 1996) (quotation omitted), and the finding is not "plausible in the light of the record as a whole," *United States v. Fullwood*, 342 F.3d 409, 415 (5th Cir. 2003) (quotation omitted).

A

Michael first appeals his enhancement for using sophisticated means.

The sophisticated-means enhancement applies if the "offense . . . involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." U.S. Sent'g Guidelines Manual § 2B1.1(b)(10)(C) (U.S. Sent'g Comm'n 2025). "Sophisticated means" is "especially complex" or "intricate" conduct such as "hiding assets or transactions" by using "fictitious entities" or "corporate shells." *Id.* § 2B1.1(b)(10)(C) cmt. n.9. The enhancement applies if sophisticated means appeared somewhere in the overall scheme—even if the scheme had unsophisticated parts. *See United States v. Miller*, 906 F.3d 373, 380 (5th Cir. 2018).

Michael argues the enhancement should not apply because he did not use offshore accounts or try to evade detection by putting PPP funds in untraceable assets. Instead, he compares his conduct to *United States v. Valdez*, where the enhancement did not apply to a defendant who only moved

money from his personal bank account to his personal investment account. 726 F.3d 684, 695 (5th Cir. 2013). Similarly, Michael argues, he only moved funds between banks and bought property. The Government responds that the enhancement applies because Michael used three different shell companies, submitted fraudulent applications in others' names, stole his father-in-law's identity, and invented a fake attorney, among other concealment.

We agree with the Government. The enhancement applies when a defendant uses "some method that made it more difficult for the offense to be detected, even if that method was not by itself particularly sophisticated." *Valdez*, 726 F.3d at 695. Michael admitted he tried to hide the fraud in several ways. For instance, he used defunct companies to get the loans, stole his father-in-law's identity to get an EIN, forged scads of records and corporate documents, exploited Tiffany's and Robles's identities to mask the fraud, and transferred funds to out-of-state companies. And he also concocted a fictional New York lawyer, stole a CPA's identity, and used fake email addresses.

Each of these acts "obscure[d] the link between the money" and the defendant and therefore made the fraud "more difficult . . . to detect." *Clements*, 73 F.3d at 1340; *see also Valdez*, 726 F.3d at 695. Michael did not need to use an offshore account to disguise the fraud, contrary to his claims. *Clements*, 73 F.3d at 1340 (upholding enhancement even though "transactions did not involve the use of offshore bank accounts"). Thus, the district court did not clearly err by applying the enhancement.

B

Michael next appeals his enhancement for sophisticated laundering.

The sophisticated-laundering enhancement applies if the defendant used "complex or intricate" means such as "fictitious entities," "shell

11

corporations," or "two or more levels (*i.e.*, layering) of transactions . . . involving criminally derived funds that were intended to appear legitimate." U.S. Sent'g Guidelines Manual § 2S1.1(b)(3) cmt. n.5. But the "conduct supporting the sophisticated laundering enhancement" may not "form[] the basis for a different enhancement for the underlying offense." *United States v. Hagen*, 60 F.4th 932, 952 (5th Cir. 2023).

Michael argues this enhancement impermissibly relies on "the same alleged sophisticated conduct" as his sophisticated-means enhancement. He points out that the Guidelines forbid applying this enhancement if the same conduct supporting it also supported a different enhancement. U.S. Sent'g Guidelines Manual § 2S1.1(b)(3) cmt. n.5(B). Alternatively, Michael claims the record does not show sophisticated laundering at all. The Government responds that there is no double-counting because separate conduct supports each enhancement.

We again agree with the Government. The district court relied on separate conduct to support the sophisticated-means and sophisticated-laundering enhancements. At sentencing, the Government explained that "several levels of transactions and transfers" independently supported the sophisticated-laundering enhancement after recounting separate conduct warranting the sophisticated-means enhancement. For example, the Government highlighted the $500,000 that moved from Tiffany's personal account to FCG's account and then to Fullerton Consulting Group's account, and the layering Michael did at a casino and by means of cashier's checks and bank credits. The district court adopted the Government's reasoning.

This is sophisticated laundering that "*clearly subjects*" Michael to this enhancement because it uses "two or more levels of transactions." *United States v. Charon*, 442 F.3d 881, 892 (5th Cir. 2006) (emphasis in original)

(quoting *United States v. Miles*, 360 F.3d 472, 482 (5th Cir. 2004)); *see also Miles*, 360 F.3d at 482 (applying the enhancement where a defendant withdrew several cashier's checks before cashing them in, buying a vehicle, and going to the casino with them). Thus, the district court did not clearly err by applying the sophisticated-laundering enhancement.

## C

Michael next challenges his enhancement for being an "organizer or leader of a criminal activity that involved five or more participants." U.S. Sent'g Guidelines Manual § 3B1.1(a). A "participant" is someone "criminally responsible for the commission of the offense" even if not "convicted." *Id.* § 3B1.1(a) cmt. n.1.

Michael admits he organized and led the scheme but disputes that it had five participants. He claims that Gaines, who helped falsify Georgetown's records and business software, was not a "participant" because she did not "knowingly" engage in criminal activity. The Government responds that the district court did not clearly err by finding Gaines a participant based on her acts corrupting Georgetown's business records.

The district court could have plausibly inferred that Gaines was a participant. The bar to be a "participant" is not high. They need not be "charged or convicted," *United States v. Boutte*, 13 F.3d 855, 860 (5th Cir. 1994), nor "commit[] each element of the offense," *United States v. Alfaro*, 919 F.2d 962, 967 (5th Cir. 1990). They only must "participate[] knowingly in some part of the criminal enterprise," *Boutte*, 13 F.3d at 860, by "play[ing] some role in bringing about the specific offense charged," *Alfaro*, 919 F.2d at 967.

Gaines played "some role" in bringing about the fraud. *Ibid.* She "entered false and fraudulent information into QuickBooks and EZ Checks

in order to generate false tax records like W-2s, W-3s, Forms 940, and Forms 941, and false employment reports." This "rebuil[ding]" of the software was a "massive task" that took "weeks," according to Michael. At minimum, a plausible view of this evidence is that Gaines, even if working at Michael's direction, knew the information was false but entered it anyway. And the information she falsified advanced "some part" of the offense because Michael used it to produce fabricated employment and tax reports for the applications. *Boutte*, 13 F.3d at 860. Thus, the district court did not clearly err by finding Gaines was the fifth participant and applying the enhancement.

## D

Finally, Michael challenges his enhancement for obstructing justice by committing perjury at Tiffany's trial.

This enhancement applies if the defendant "willfully obstructed or impeded . . . the administration of justice" which can include "committing . . . perjury" or "providing materially false information to a judge." U.S. SENT'G GUIDELINES MANUAL § 3C1.1 & cmt. n.4(B), (F). Perjury is giving "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Smith*, 804 F.3d 724, 737 (5th Cir. 2015) (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)).

Michael acknowledges he "made conflicting statements at trial from those [he] made to investigators." Even so, Michael argues, the district court erred because it did not make "specific findings of points of perjury." The Government counters that the court's specific findings support each element of perjury.

The district court sufficiently found that Michael committed perjury. To be sure, the "*preferable* practice" is for a district court to "address each element of the alleged perjury in a separate and clear finding." *United States*

*v. Storm*, 36 F.3d 1289, 1295 (5th Cir. 1994) (emphasis added). But a court's findings are sufficient if its explanation supports each element of perjury, even if the court did not spell it out. *See ibid.* (explaining findings sufficient if the court finds there was an "an obstruction or impediment of justice that encompasses all of the factual predicates for a finding of perjury"); *see also United States v. Laury*, 985 F.2d 1293, 1309 (5th Cir. 1993) (holding district court's finding that "[s]tatements made by the defendant were made in an effort to obstruct or impede the administration of justice during prosecution" was "sufficient").

The court met that standard here. It found that Michael gave "demonstrably false" testimony for "hour after hour" concerning Tiffany's knowledge about the funds' source and the laundering activities. That false testimony, the court found, involved a material matter because it went to the "elements of the offense." And it explained that Michael's perjury was willful because it "was part of a plan that he had early on in th[e] scheme to take responsibility" for the conspiracy. These findings support each element of perjury despite the court not using the elements' exact wording. Thus, the court did not clearly err by finding Michael committed perjury and applying the obstruction enhancement.

## III

We turn now to Tiffany's appeal. She raises three issues: whether the district court erred when it (1) denied her new-trial motion, (2) applied the enhancement for obstruction of justice, and (3) calculated the intended-loss amount. Each challenge fails.

## A

We begin with Tiffany's claim that the district court erred by denying her motion for a new trial. "[M]otions for new trial are disfavored and must be reviewed with great caution." *United States v. Piazza*, 647 F.3d 559, 565

(5th Cir. 2011). So, we review a district court's denial of a motion for new trial for abuse of discretion. *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 504 (5th Cir. 2012). To get a new trial for newly discovered evidence, the movant must prevail on the five so-called *Berry* factors:

> (1) the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) the failure to detect the evidence was not due to the defendant's lack of diligence; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence if introduced at a new trial would probably produce an acquittal.

*Piazza*, 647 F.3d at 565.

Tiffany argues she deserved a new trial because new evidence in Michael's PSR revealed that his ex-wife unknowingly helped him commit bank fraud in the 1990s. Tiffany claims she could not uncover this evidence even with due diligence, and she contends that it is material, admissible, and would probably have resulted in an acquittal if the jury heard it. For its part, the Government highlights the "ample evidence" proving that Tiffany "was a knowing participant in the conspiracies, rather than an innocent dupe." And the Government asserts Tiffany did not exercise due diligence and partly failed to preserve her argument that the evidence is admissible.

The district court did not abuse its discretion by denying the motion.

To start, evidence that Michael instructed his ex-wife to sign checks and documents about 25 years ago without telling her what they were for would not have acquitted Tiffany. New evidence must "probably produce an acquittal." *United States v. Peña*, 949 F.2d 751, 758 (5th Cir. 1991). The new evidence does not do so if it merely "bolsters a theory advanced at trial" but does not "provide a new theory of the case." *United States v. Shugart*, 117 F.3d 838, 848 (5th Cir. 1997).

The newly discovered evidence that Michael enlisted his ex-wife in fraud without her knowledge says nothing about Tiffany's state of mind decades later. Tiffany suggests it could have bolstered her innocent dupe theory, but it fails to address the "considerable evidence of" Tiffany's involvement and guilt presented at trial. *United States v. Wall*, 389 F.3d 457, 471 (5th Cir. 2004). That evidence includes how Tiffany (1) helped manage Georgetown; (2) had her name and personal information on a fraudulent PPP application; (3) knew that $500,000 in her personal bank account was PPP money; (4) moved those funds to other accounts in laundering transactions; (5) helped recruit Robles to the scheme and helped him lie to the bank; (6) knew that $1.6 million in another account was PPP funds but still helped Robles get a $115,000 cashier's check for a Toterhome; (7) knew of other expensive transactions made with PPP funds; (8) helped manage out-of-state entities funded by PPP money; and (9) helped shuffle fraudulent funds out of existing accounts via a series of cashier's checks and bank credits when she realized an investigation began.

Taken together, this evidence establishes Tiffany's knowledge of the fraudulent scheme. Michael's telling his ex-wife to sign some checks and documents 25 years ago does not upend the ample, independent evidence showing Tiffany's knowledge. *See Shugart*, 117 F.3d at 848 ("The jury rejected [Tiffany's] version of the events, and . . . it is unlikely that [Tiffany's] 'new' evidence would disturb that conclusion.").

That is enough to conclude the court did not abuse its discretion. But Tiffany fails on other *Berry* factors as well.

For instance, she could have discovered the evidence by exercising due diligence. Tiffany knew of Michael's ex-wife and his previous fraud; she could have inquired further during "many conversations" with Michael, her primary and most cooperative witness. *See United States v. Sullivan*, 112 F.3d

17

180, 183 (5th Cir. 1997) (explaining there is "lack of due diligence" if "defendant knew of information and had opportunity to investigate matter further" (citing *United States v. Time*, 21 F.3d 635, 642 (5th Cir. 1994)).

The district court also held that the new evidence would likely be inadmissible under Federal Rule of Evidence 403. Tiffany argued for the evidence's relevance, but she did not contest the district court's view that Rule 403, even if relevant, would have barred its admission. Accordingly, she waived her argument that it would be admissible. *See United States v. Pompa*, 434 F.3d 800, 806 n.4 (5th Cir. 2005); *Wall*, 389 F.3d at 470–71 ("[A] motion for new trial may not be based on inadmissible evidence.").

Thus, the district court did not abuse its discretion by denying her new-trial motion.

B

Tiffany next challenges her enhancement for obstructing justice by procuring Michael's perjury.

This enhancement applies if the defendant "willfully obstructed or impeded . . . the administration of justice" by "suborning . . . perjury." U.S. Sent'g Guidelines Manual § 3C1.1 & cmt. n.4(B). "Subornation occurs whenever the defendant 'procures another to commit any perjury.'" *United States v. Johnson*, 352 F.3d 146, 148 (5th Cir. 2003) (quoting 18 U.S.C. § 1622). We review the application of the enhancement *de novo* and the district court's factual findings for clear error. *Lopez*, 168 F.4th at 320.

Tiffany contends the enhancement should not apply because she did not suborn Michael's perjury by calling him to testify knowing he would lie. She instead argues that suborning perjury occurs only when a defendant tells a witness to lie or supplies him the false testimony. The Government responds that the court plausibly found that Tiffany suborned Michael's

perjury because Michael promised to take the fall, Michael and Tiffany conversed for hours alone and with defense counsel about Michael's planned testimony, and Tiffany's defense counsel asked deliberated questions designed to elicit Michael's lies.

The district court did not clearly err by finding Tiffany suborned Michael's perjury. To be sure, suborning perjury requires something more than mere knowledge that a witness will falsely testify. *See Johnson*, 352 F.3d at 148 (explaining that suborning perjury requires a finding that a defendant "procured" the perjury). But a defendant need not affirmatively tell a witness to testify falsely to suborn his perjury. Instead, a defendant can suborn perjury by insinuating the witness should falsely testify, *see United States v. Kilgarlin*, 157 F. App'x 716, 720 (5th Cir. 2005) (per curiam), or by simply "induc[ing] his lawyer to call" a witness he knows will lie, *United States v. Lowder*, 148 F.3d 548, 553 (5th Cir. 1998).

Here, with the court's "superior knowledge of the witnesses and proceedings," it "could well have inferred" by a preponderance of the evidence that Tiffany suborned Michael's perjury. *United States v. Graves*, 5 F.3d 1546, 1555 (5th Cir. 1993) (emphasis omitted). The court found that Tiffany knew Michael intended to take the fall. And Michael "had many conversations with" Tiffany "about what questions" her attorneys should ask him that elicited his perjury. Michael later met with Tiffany's defense counsel "for hours" to "go over what questions to ask" him that elicited his perjury. The court inferred that this "circumstantial [evidence] [wa]s overwhelming" that Tiffany "procure[d] the testimony of a witness who previously had said if this goes down, [he]'ll take the fall" and "ask[ed] specific questions that were going to exonerate her and elicit a lie repeatedly from" Michael. Based on the record, we are not "left with the definite and

24-50800
c/w No. 24-50829

firm conviction" that it clearly erred by finding Tiffany suborned Michael's perjury.[1] *Graves*, 5 F.3d at 1556.

## C

Finally, Tiffany claims the court incorrectly calculated her amount of intended loss by including the first PPP loan for Starx. Defendants convicted of fraud are responsible for the amount of loss they intended to cause by their conduct. *See United States v. Harris*, 597 F.3d 242, 249 (5th Cir. 2010); U.S. SENT'G GUIDELINES MANUAL § 2B1.1(b). This loss amount may include, as "relevant conduct," reasonably foreseeable acts that furthered the scheme and were within its scope committed by others after the defendant joined. U.S. SENT'G GUIDELINES MANUAL § 1B1.3(a)(2) & cmt. n.3(B).

### 1

We first address the parties' dispute over the standard of review. Tiffany claims we review for clear error. Before the district court, she objected that the PSR should not include the Starx loan as intended loss because it was neither charged in the indictment nor fraudulent. But she did not contend it could not count as relevant conduct. The Government claims we should review for plain error because Tiffany's claim that the Starx loan should not count as relevant conduct is a "new challenge" never presented to the district court.

---

[1] Moreover, even assuming *arguendo* that the court did clearly err, the error was harmless. Tiffany's 108-month sentence fell within the Guidelines range with or without the obstruction enhancement. So, the court explained it "would have sentenced [Tiffany] to the same thing" either way. Error is harmless if, like here, a court considers two Guidelines ranges, one correct and the other incorrect, and explained "it would give the same sentence either way." *United States v. Guzman-Rendon*, 864 F.3d 409, 411 (5th Cir. 2017).

20

Plain-error review applies. Tiffany objected to the inclusion of the Starx loan in the intended-loss calculation on two grounds: The loan was not charged in her indictment, and it was not fraudulent. But now she offers a new reason: The Starx loan should not count as relevant conduct. When given an opportunity below to respond to the Government's argument that the loan was relevant conduct, Tiffany's counsel doubled down that "if it wasn't charged, it wasn't illegal, and if it wasn't illegal, then it shouldn't be counted. So that's my argument on that." Thus, her failure to respond to the Government's relevant-conduct argument deprived the district court of "an opportunity for correction" on that ground. *United States v. Neal*, 578 F.3d 270, 272 (5th Cir. 2009).

To prevail on plain-error review, Tiffany must show "(1) an error that has not been affirmatively waived, (2) that is clear or obvious, and (3) that affected [her] substantial rights." *United States v. Brooks*, 33 F.4th 734, 739 (5th Cir. 2022) (quotation omitted). If she shows all three, the court may exercise its discretion to correct the error only if failing to do so would "seriously affect the fairness, integrity[,] or public reputation of judicial proceedings." *Ibid.* (quotation omitted).

2

Turning to the challenge, Tiffany argues the court erred by considering the Starx loan relevant conduct because it preceded her involvement in the conspiracy. Even though she knew about the Starx loan, she claims mere knowledge is not enough for relevant conduct. The Government points to Tiffany's PSR, which says she was part of the conspiracy in April 2020, the month the Starx loan application was submitted. Because Tiffany did not present rebuttal evidence, the Government argues the district court was entitled to rely on the PSR's findings. Alternatively, the Government claims Tiffany does not show clear

or obvious error because her management role at Georgetown and central role in the conspiracy could allow the court to infer that she joined the conspiracy in April 2020, as the PSR found.

We agree with the Government. Tiffany fails to show clear or obvious error. To start, the court was entitled to rely "upon the information in the PSR as long as the information b[ore] some indicia of reliability." *United States v. Scher*, 601 F.3d 408, 413 (5th Cir. 2010). The PSR found that "[b]eginning in April 2020" Tiffany "knowingly made false statements . . . in connection with the PPP loan applications." And it highlighted that Tiffany was "being held accountable for six PPP loans including [the] Starx" loan "funded on April 22, 2020."

Tiffany presented no "rebuttal evidence to demonstrate that the information in the PSR [was] inaccurate or materially untrue." *Scher*, 601 F.3d at 413. And nothing indicates the PSR's finding lacked "indicia of reliability." *Ibid.* Tiffany managed Georgetown and helped pay its workers, conspired to submit at least one other fraudulent loan in April 2020, and even knew about the Starx loan according to Michael. Even now, she offers no evidence that she only joined the conspiracy sometime after April 22 (when the Starx application was submitted) but before May 8 (when she submitted the FCG application). Thus, the district court could rely on the PSR. *See Scher*, 601 F.3d at 413. The district court therefore did not clearly and obviously err.

D

Tiffany's written judgment states she was convicted of (1) conspiracy to commit bank fraud and wire fraud and (2) money laundering. Tiffany, however, was acquitted of conspiracy to commit wire fraud. Thus, the judgment should not state she was convicted of conspiracy to commit wire fraud under 18 U.S.C. § 1343. We therefore REMAND for correction of a

clerical error in the judgment under Federal Rule of Criminal Procedure 36. *See United States v. Cooper*, 979 F.3d 1084, 1088–89 (5th Cir. 2020).

## IV

We AFFIRM Michael's and Tiffany's sentences and the district court's denial of Tiffany's motion for a new trial. We REMAND for correction of the clerical error in Tiffany's judgment.